**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| RONY ESTUARDO PEREZ-GUZMAN, AKA Ronnie Perez-Guzman, *Petitioner*, | No. 13-70579 |
| | Agency No. A200-282-241 |
| v. | |
| LORETTA E. LYNCH, Attorney General, *Respondent.* | OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted May 4, 2016
Pasadena, California

Filed August 31, 2016

Before: Raymond C. Fisher, Milan D. Smith, Jr.,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Fisher

## SUMMARY[*]

### Immigration

The panel granted in part and denied in part a petition for review of a decision of the Board of Immigration Appeals. The panel held that the Attorney General's regulation, 8 C.F.R. § 1208.31, precluding an individual subject to a reinstated removal order from applying for asylum, is a reasonable interpretation of the statutory scheme and is therefore entitled to deference at step two of the framework established under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The panel also remanded the petitioner's withholding of removal and Convention Against Torture claims in light of intervening authorities, including *Henriquez-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013) (en banc), and *Madrigal v. Holder*, 716 F.3d 499 (9th Cir. 2013).

The panel concluded that Congress has not directly spoken to the interplay between 8 U.S.C. § 1158(a)(1) (permitting "[a]ny alien" to apply for asylum "irrespective of such alien's status") and 8 U.S.C. § 1231(a)(5) (barring aliens subject to reinstated removal orders from "any relief under" chapter 12 of title 8 of the U.S. Code, which includes the asylum statute).

At *Chevron* step two, however, the agency's reconciliation of these two provisions through 8 C.F.R. § 1208.31(e) was reasonable, and hence entitled to deference.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel also held that the petitioner's procedural challenges to § 1208.31(e), under the Administrative Procedure Act, were untimely because they were not brought within six years after adoption of the regulation.

## COUNSEL

Eric M. Fraser (argued), Osborn Maledon, P.A., Phoenix, Arizona, for Petitioner.

Tim Ramnitz (argued); Anthony C. Payne, Senior Litigation Counsel; Joyce R. Branda, Acting Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Keren Zwick (argued), National Immigrant Justice Center, Chicago, Illinois; Stephen W. Manning, Immigrant Law Group P.C., Portland, Oregon; Robin L. Goldfaden, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, San Francisco, California; for Amicus Curiae American Immigration Lawyers Association, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, and National Immigrant Justice Center.

**OPINION**

FISHER, Circuit Judge:

Rony Estuardo Perez-Guzman (Perez), a native and citizen of Guatemala, entered the United States without inspection for the first time in 2011. The Department of Homeland Security (DHS) apprehended and removed him after expedited removal proceedings. Perez reentered the United States in 2012 and was again apprehended by DHS, which reinstated the earlier removal order. After an asylum officer found Perez had established a reasonable fear of being tortured if removed to Guatemala, he was referred to an Immigration Judge (IJ) for consideration of his applications for withholding of removal and protection under the Convention Against Torture (CAT). Because Perez was subject to a reinstated removal order, the IJ declined to consider his application for asylum. The IJ denied on the merits his requests for withholding of removal and protection under CAT, and the Board of Immigration Appeals (BIA) affirmed.

The parties agree that we must remand to the BIA on Perez's claims for withholding of removal and protection under CAT in light of intervening circuit precedent. The issue we consider here is whether an individual subject to a reinstated removal order is eligible to apply for asylum under the Immigration and Nationality Act (INA), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). We hold Congress has not clearly expressed whether 8 U.S.C. § 1231(a)(5), enacted by IIRIRA, prevents an individual subject to a reinstated removal order from applying for asylum under 8 U.S.C. § 1158. We conclude, however, that the Attorney General's regulation

preventing Perez from applying for asylum under these circumstances is a reasonable interpretation of the statutory scheme, and is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Accordingly, we remand to the BIA only for reconsideration of Perez's withholding and CAT claims.

## I. Background

### A. Factual Background

Perez alleges that three incidents in his home county of Guatemala make him eligible for asylum, withholding of removal and CAT protection. First, Perez was struck by a stray bullet fired by members of a gang extorting a local businessman and gave a statement to police about the gang members involved in the shooting. After they were released from jail, the gang members visited Perez's house while he was away.

Second, Perez discovered his name appeared on a "death squad kill list" compiled by a group of police officers and soldiers who engaged in extrajudicial law enforcement by executing suspected gang members, guerillas and other criminals. Other individuals on the list were later killed, including Perez's cousin. Shortly after his cousin's murder, Perez fled his hometown.

Finally, Perez was abducted by individuals purporting to be Guatemalan police officers. The kidnappers blindfolded Perez, tied him to a chair and beat him before realizing they had abducted the wrong man. The kidnappers discussed killing Perez, but released him with the threat that they would kill him if he reported the attack.

Perez left Guatemala and entered the United States for the first time in June 2011, but was stopped by the Border Patrol. He later testified before the IJ that the Border Patrol agents never asked him whether he feared returning to Guatemala, but only "came out with a paper" for him to sign certifying that he had entered the country illegally. Records of a brief interview conducted during the expedited removal process, however, note Perez answered in the negative when asked whether he feared returning to Guatemala. He was removed to Guatemala in July 2011.

Perez reentered the United States and was apprehended a second time in January 2012. DHS reinstated his earlier removal order. Because Perez expressed a fear of returning to Guatemala, he was referred to an asylum officer, who found his fear of persecution or torture was reasonable and referred him to an IJ for further proceedings.

Before the IJ, Perez sought asylum, withholding of removal and protection under CAT. The IJ, however, concluded Perez was ineligible for asylum because he had previously been removed and DHS had reinstated his earlier removal order. The IJ also denied Perez's applications for withholding of removal and CAT protection, concluding he had not established a likelihood that he would either be persecuted on a protected ground or tortured with government consent or acquiescence if returned to Guatemala. The BIA affirmed the denial of withholding of removal and CAT protection on the merits. It explained it would not reach the merits of Perez's asylum claim and that "[b]ecause the Department of Homeland Security . . . reinstated a prior order of removal in this case, the Immigration Judge's

consideration was limited to the applicant's request for withholding of removal and CAT protection. *See* 8 C.F.R. § 1208.31(e)."

## B. Legal Background

Perez's claim turns on the interplay between two provisions of the INA – 8 U.S.C. § 1158, the asylum statute, and 8 U.S.C. § 1231(a)(5), the reinstatement bar.[1]

The Refugee Act of 1980 directed the Attorney General to establish procedures for granting asylum and enacted the initial version of § 1158, which afforded any alien the right to apply for asylum irrespective of immigration status. *See* Refugee Act of 1980, Pub. L. No. 96-212, § 208, 94 Stat. 102 (codified as amended at 8 U.S.C. § 1158). Although Congress later amended the statute to prevent individuals convicted of aggravated felonies from receiving asylum, *see* Immigration Act of 1990, Pub. L. No. 101-649, § 515, 104 Stat. 4978, the law governing asylum applications remained largely unchanged until the enactment of IIRIRA, Pub. L. No. 104-208, Div. C, 110 Stat. 3009 (1996).

In its post-IIRIRA form, § 1158(a)(1) retains its original scope, stating that "[*a*]*ny alien* who is physically present in the United States . . . *irrespective of such alien's status*, may apply for asylum in accordance with this section." § 1158(a)(1) (emphasis added). A few statutory exceptions qualify this broad eligibility, barring asylum applications from individuals who can be resettled in another country, *see* § 1158(a)(2)(A), failed to timely apply, *see* § 1158(a)(2)(B),

---

[1] Unless otherwise noted, all citations are to title 8 of the United States Code.

or previously were denied asylum, *see* § 1158(a)(2)(C). Section 1158(a)(2)(D) creates an exception to the exceptions in subsections (a)(2)(B) and (C), stating in relevant part that an individual may make a second application for asylum notwithstanding a previous denial if he shows changed circumstances affecting his eligibility for asylum. *See* § 1158(a)(2)(D).

IIRIRA also revised the effect of reinstatement, the summary removal process whereby the government reinstates and executes an individual's previous removal order rather than initiating a new removal proceeding against him. Before IIRIRA, only a subset of individuals who illegally reentered the country were subject to reinstatement of their earlier removal orders; the rest were placed in ordinary removal proceedings, even on subsequent reentries. *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 33–35 (2006). In addition, individuals in the "limited class of illegal reentrants" subject to reinstatement could still "seek some varieties of discretionary relief" from their reinstated removal order. *Id.* at 34. With IIRIRA, however, Congress replaced the old reinstatement provisions with "one that toed a harder line," and "[u]nlike its predecessor, . . . applie[d] to all illegal reentrants, explicitly insulate[d] the [reinstated] removal orders from review, and generally foreclose[d] discretionary relief from the terms of the reinstated order." *Id.* at 34–35 (noting the availability of withholding of removal). This reinstatement bar, codified at § 1231(a)(5), states

> [i]f the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its

original date and is not subject to being reopened or reviewed, *the alien is not eligible and may not apply for any relief under this chapter*, and the alien shall be removed under the prior order at any time after the reentry.

§ 1231(a)(5) (emphasis added). "[T]his chapter" refers to chapter 12 of title 8 of the U.S. Code, which contains both the asylum statute and reinstatement bar.

Consistent with this section, the Attorney General promulgated 8 C.F.R. § 1208.31(e),[2] which states in relevant part that "[i]f an asylum officer determines that an alien [subject to a reinstated removal order] has a reasonable fear of persecution or torture, the officer shall so inform the alien and issue a . . . [r]eferral to [an] Immigration Judge, *for full consideration of the request for withholding of removal only*." 8 C.F.R. § 1208.31(e) (emphasis added).[3] The notice published in the Federal Register stated in its summary that "[f]or persons subject to reinstatement, . . . the rule establishes a screening mechanism" similar to the one used in expedited removal proceedings. *See* Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8478

---

[2] The regulation was originally promulgated as 8 C.F.R. § 208.31(e), but the administrative regulations governing immigration proceedings were recodified in 2003 to reflect the transfer of the Immigration and Nationality Service's functions to DHS. *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824 (Feb. 28, 2003). For convenience, we refer to the regulation as 8 C.F.R. § 1208.31(e) throughout this opinion.

[3] A separate regulation permits an individual subject to a reinstated removal order to seek CAT protection as well. *See* 8 C.F.R. § 1208.16(c)(4).

(Feb. 19, 1999). The notice went on to explain that the new process was intended "to rapidly identify and assess" claims for withholding of removal and CAT protection made by individuals subject to reinstated removal orders and other forms of expedited removal to "allow for the fair and expeditious resolution of such claims without unduly disrupting the streamlined removal processes applicable to these aliens." *Id.* at 8479; *see also id.* at 8485 (discussing 8 C.F.R. § 1208.31 specifically). The notice further stated the agency's conclusion that such individuals, including "aliens subject to reinstatement of a previous removal order under [§ 1231(a)(5)]," were "ineligible for asylum" but "may be entitled to withholding of removal" or CAT protection. *Id.* at 8485. The notice identified a number of statutes giving the agency authority to promulgate regulations to govern asylum and withholding procedures, including § 1158. S*ee id.* at 8487 (listing the authorities for 8 C.F.R. Part 208 generally).

## II. Discussion

As noted, the parties agree remand is appropriate on Perez's withholding of removal and CAT claims in light of intervening circuit precedent. The only disputed question is whether Perez is entitled to a remand on his asylum claim as well. We conclude he is not.

### A. Exhaustion

At the outset, we reject the government's contention that Perez failed to exhaust his argument for asylum eligibility before the BIA. Although we generally lack jurisdiction to review a final agency order unless administrative remedies have been exhausted, *see Alvarado v. Holder*, 759 F.3d 1121, 1127 (9th Cir. 2014), exhaustion is not required where it

would be futile to raise a particular issue before the agency. Here, the BIA rejected Perez's asylum claim under 8 C.F.R. § 1208.31(e), which bars individuals in reinstatement proceedings from applying for asylum. Because the BIA had no authority to disregard this regulation, exhaustion would have been futile. *See Coyt v. Holder*, 593 F.3d 902, 905 (9th Cir. 2010) ("Because the BIA has no authority to declare a regulation invalid, 'the exhaustion doctrine does not bar review of a question concerning the validity of an INS regulation because of a conflict with a statute.'" (quoting *Espinoza-Gutierrez v. Smith*, 94 F.3d 1270, 1273 (9th Cir. 1996))); *Espinoza-Gutierrez*, 94 F.3d at 1273 (observing that an argument contesting the validity of an agency's own regulations will "necessarily . . . fall[] on deaf ears" because the BIA "simply has no authority to invalidate a regulation that it is bound to follow").

## B. Asylum

Perez argues the asylum statute's language permitting "[a]ny alien" to apply for asylum "irrespective of such alien's status" unambiguously permits him to apply for asylum notwithstanding his reinstated removal order. § 1158(a)(1). The government, in response, argues the reinstatement bar's statement that an individual subject to a reinstated removal order "is not eligible and may not apply for any relief under this chapter" unambiguously makes Perez ineligible to apply for asylum, a form of relief arising under the same chapter. § 1231(a)(5). The question is whether § 1158's permission to apply for asylum or § 1231(a)(5)'s denial of any relief falling within the same chapter governs the class of individuals who, like Perez, are subject to reinstated removal orders.

To answer this question of statutory interpretation, we follow the framework laid out in *Chevron*. "Under the first step, we determine 'whether Congress has directly spoken to the precise question at issue.'" *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1054 (9th Cir. 2010) (quoting *Chevron*, 467 U.S. at 842–43). If the intent of Congress is clear, our inquiry ends and we give effect to Congress' unambiguously expressed intent. *See id.* If, on the other hand, Congress has not spoken to a particular issue or the statute is ambiguous, we may consider the responsible agency's interpretation of the statutory scheme. "[I]f the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

In addressing this question, we are not writing on a clean slate. Three other circuits have already considered the interplay between § 1158 and § 1231. Each has concluded that individuals subject to reinstated removal orders may not apply for asylum relief. *See Jimenez-Morales v. U.S. Att'y Gen.*, 821 F.3d 1307, 1310 (11th Cir. 2016); *Ramirez-Mejia v. Lynch*, 794 F.3d 485, 491 (5th Cir. 2015) (relying on § 1231(a)(5)'s plain language, as well as relevant regulations and case law); *Herrera-Molina v. Holder*, 597 F.3d 128, 138–39 (2d Cir. 2010) (discussing § 1231(a)(5)'s text as well as relevant circuit precedent and regulations). Although we find these opinions persuasive in some respects, those circuits did not discuss § 1158(a)(1), but mentioned it only in passing, *see Ramirez-Mejia*, 794 F.3d at 490, or not at all, *see Jimenez-Morales*, 821 F.3d at 1310; *Herrera-Molina*, 597 F.3d at 38–39. Thus, although we reach the same

conclusion as these other courts, we do so on somewhat different reasoning.

### 1. *Chevron* Step One

At step one of *Chevron*, we conclude Congress has not directly spoken to the interplay of § 1158(a)(1) and § 1231(a)(5). On the contrary, § 1158(a)(1) and § 1231(a)(5) are in apparent conflict. Section 1158 broadly grants "any alien" the opportunity to seek asylum, "regardless of such alien's status," subject only to a few exceptions not applicable here. Section 1231, by contrast, expressly bars aliens subject to reinstated removal orders from any relief under chapter 12, the chapter that includes asylum. In attempting to resolve this apparent conflict, we begin with the language of the statute, reading it in context and giving undefined terms their ordinary meanings. *See CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 283–84 (2011); *Synagogue v. United States*, 482 F.3d 1058, 1061–62 (9th Cir. 2007). "Our goal is to understand the statute 'as a symmetrical and coherent regulatory scheme' and to 'fit, if possible, all parts into a harmonious whole.'" *Gila River Indian Cmty. v. United States*, 729 F.3d 1139, 1145 (9th Cir. 2013) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

Each party argues the plain language of § 1158 and § 1231(a)(5) can be harmonized by interpreting one section as establishing an absolute rule to which the other section must yield. Perez contends § 1231(a)(5) does not really bar "any relief" under chapter 12, whereas the government says § 1158(a)(1) does not really permit "any alien" to apply for asylum. "Read naturally, the word 'any' has an expansive meaning." *United States v. Gonzalez*, 520 U.S. 1, 5 (1997).

But within a particular statute, "[a]mbiguity is a creature . . . of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994); *see also Dada v. Mukasey*, 554 U.S. 1, 16 (2008) ("In reading a statute we must not 'look merely to a particular clause,' but consider 'in connection with it the whole statute.'" (quoting *Kokozha v. Belford*, 417 U.S. 642, 650 (1974)).

We agree with the parties that although both subsections use absolute language, each is qualified in certain respects when read in context. The text of § 1158(a)(1) states that "[a]ny" alien may apply for asylum "in accordance with this section," regardless of immigration status. § 1158(a)(1). The rest of § 1158, however, undercuts the breadth of that guarantee by including a series of exceptions preventing certain aliens from applying under specific circumstances. *See* § 1158(a)(2)(A)–(C). Section 1231(a)(5)'s text is perhaps stronger in stating that the reinstatement of a prior removal order precludes "any relief under this chapter." § 1231(a)(5). But our well-settled interpretation of § 1231(a)(5) recognizes that, notwithstanding the prohibition on "any relief," withholding of removal and CAT protection are available to individuals in reinstatement proceedings. *See Ixcot v. Holder*, 646 F.3d 1202, 1207 (9th Cir. 2011) ("Notwithstanding the seemingly absolute bar . . . aliens subject to [§ 1231(a)(5)] 'may seek withholding of removal' . . . ." (quoting *Fernandez-Vargas*, 548 U.S. at 35 n.4)); *Ortiz-Alfaro v. Holder*, 694 F.3d 955, 956 n.1 (9th Cir. 2012) (assuming CAT "constrains the Attorney General from removing aliens . . . notwithstanding" the language of § 1231(a)(5)). The Attorney General's regulations agree. *See* 8 C.F.R. § 1208.31(e) (allowing withholding of removal);

8 C.F.R. § 1208.16(c)(4) (allowing CAT protection); 8 C.F.R. § 214.14(c)(1)(ii) (allowing U Visas).**[4]**

The relevant question, however, is not simply whether the two provisions are absolute, but how Congress intended to harmonize them.  If one subsection's text were clearly intended to take precedence over the other, our inquiry would be at an end.  That *both* provisions are qualified in certain respects moves us no closer to a clear answer.  Neither subsection gives an indication of how Congress intended to resolve a conflict between the two.  We therefore turn to the other "traditional tools of statutory construction" in search of an answer.  *See Chevron*, 467 U.S. at 843 n.9.

Both Perez and the government invoke the canon of *generalia specialibus non derogant* – the "principle that the specific governs the general" – to advance their preferred interpretation of the statutory scheme.  *See Nitro-Lift Techs., LLC v. Howard*, 133 S. Ct. 500, 504 (2012).  The canon provides that a "narrow, precise,  and specific" statutory provision is not overridden by another provision "covering a more generalized spectrum" of issues. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153–54 (1976).  When two statutes come into conflict, courts assume Congress intended specific

---

**[4]** The government suggested for the first time at oral argument that the two sections do not actually conflict if "relief" is understood as a term of art under the INA.  It posits that, in barring any "relief," § 1231(a)(5) does not prevent individuals from seeking nondiscretionary forms of "protection" like withholding of removal and protection under CAT. Although one other circuit found this purported distinction persuasive, *see Ramirez-Mejia*, 794 F.3d at 489, we treat this argument as waived because any textual distinction between the two terms was raised for the first time at oral argument, *see Harger v. Dep't of Labor*, 569 F.3d 898, 904 n.9 (9th Cir. 2009).

provisions to prevail over more general ones, *see Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228–29 (1957), the assumption being that the more specific of two conflicting provisions "comes closer to addressing the very problem posed by the case at hand and is thus more deserving of credence," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183 (2012).

As Scalia and Garner acknowledge, however, it is "[s]ometimes . . . difficult to determine whether a provision is a general or a specific one." *Id.* at 187. Here, the difficulty is that each subsection is specific in certain respects and general in others. Section 1158(a)(1) is more specific in that it speaks narrowly to the rules governing asylum applications. Conversely, § 1231(a)(5) is more specific in that it speaks directly to the particular subset of individuals, like Perez, who are subject to reinstated removal orders. Although the government's position may have a slight edge, both parties' arguments on this point are sensible. We conclude the general-specific canon does not help to *clearly* discern Congress's intent as to which section should take precedence here.

Nor does the legislative history of § 1158 and § 1231(a)(5) resolve this ambiguity. IIRIRA's amendments to the INA show Congress intended to add more detail to the existing asylum scheme while simultaneously expanding the scope and consequences of the reinstatement of an earlier removal order. Because neither party has identified any legislative materials speaking directly to the availability of asylum in reinstatement proceedings, however, we conclude the legislative history "is silent on the precise issue before us." *Chevron*, 467 U.S. at 862.

Perez and amici argue IIRIRA broadened the scope of § 1158 when it amended the statute slightly to allow "[a]ny alien," rather than "an alien," to apply for asylum. But the rest of § 1158(a)(1)'s text reenacted the existing language permitting the alien, "regardless of such alien's status, to apply for asylum." *Compare* 8 U.S.C. § 1158(a) (1980) (permitting "an alien physically present in the United States, . . . , irrespective of such alien's status, to apply for asylum"), *with id.* § 1158(a)(1) (1996) (providing that "[a]ny alien who is physically present in the United States . . . , irrespective of such alien's status, may apply for asylum"). We are reluctant to assume Congress' intent is clear from this change alone, and must read this amendment in concert with the simultaneous enactment of § 1231(a)(5), which was a completely new addition in IIRIRA. In adopting both changes simultaneously, Congress effectively adopted "a clear limitation in one section" – § 1231(a)(5) – "without amending another section" dealing with the same subject matter. *See Ramirez-Mejia*, 794 F.3d at 490. This might suggest Congress assumed § 1231(a)(5)'s use of the phrase "any relief under this chapter" would most naturally be read as precluding asylum applications. *See McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991) ("It is presumable that Congress legislates with knowledge of our basic rules of statutory construction. . . .").

In sum, when read in context and compared with each other, § 1158(a)(1) and § 1231(a)(5) reveal no clear congressional intent on how to resolve a claim, like Perez's, which places the two sections in conflict. Both provisions appear to establish broad and conflicting rules. On closer examination, however, it is apparent that both provisions are qualified in certain respects – § 1158 by various textual exceptions, and § 1231(a)(5) by the government's practice

and our precedent. Furthermore, we cannot say the general-specific canon clearly resolves the ambiguity in the statutory scheme.[5]  We therefore conclude Congress has not spoken directly to whether individuals subject to reinstated removal orders may apply for asylum.  We accordingly proceed to *Chevron*'s second step, where we ask whether the agency's interpretation of an ambiguous statute is a permissible construction of the statutory scheme. *See Chevron*, 467 U.S. at 843.

## 2. *Chevron* Step Two

Before we address the substance of the agency's interpretation, we must briefly discuss Perez and amici's argument that 8 C.F.R. § 1208.31(e) should not be accorded *Chevron* deference because the agency failed to adequately explain its reasoning when it promulgated the regulation in 1999.  We do not reach the merits of this argument because it is untimely.

---

[5] Perez also cites the "longstanding principle of construing any lingering ambiguities in [removal] statutes in favor of the alien." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987).  Like the rule of lenity, this rule is a tiebreaker in the case of insoluble – or "lingering" – ambiguity. *Id.*; *see Lagandaon v. Ashcroft*, 383 F.3d 983, 993 (9th Cir. 2004).  As we have held in the criminal context, however, "[t]he rule of lenity . . . does not prevent an agency from resolving statutory ambiguity through a valid regulation." *Pacheco-Camacho v. Hood*, 272 F.3d 1266, 1271–72 (9th Cir. 2001) (citing *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18 (1995)); *see also Mujahid v. Daniels*, 413 F.3d 991, 998–99 (9th Cir. 2005) (prioritizing the rule of lenity over *Chevron* deference "is tenuous at best and requires us to fill in more blanks than we are willing to do").

*a. Timeliness*

Procedural challenges to agency rules under the Administrative Procedure Act are subject to the general six-year limitations period in the U.S. Code. *See Wind River Mining Corp. v. United States*, 946 F.2d 710, 713–14 (9th Cir. 1991) (citing 28 U.S.C. § 2401(a)). Under *Wind River*, challenges to a "mere procedural violation in the adoption of a regulation or other agency action" must be brought within six years of the agency rulemaking, whereas challenges to "the substance of an agency's decision as exceeding constitutional or statutory authority" may be brought any time "within six years of the agency's application of the disputed decision to the challenger." *Id.* at 715–16. Whether Perez's challenges are timely therefore depends on whether they are procedural or substantive.[6]

Perez's central claim is that the Attorney General's refusal to consider his asylum application is based on an unreasonable interpretation of § 1158 and § 1231(a)(5). The parties agree this is a substantive challenge. Because it was brought within six years of the BIA's refusal to consider Perez's asylum application, it is timely. *See Cal. Sea Urchin Comm'n v. Bean*, ___ F.3d ___, 2016 WL 3739700, at *4 (9th

---

[6] Perez argues we should not rule on timeliness because the government did not raise it until supplemental briefing. We have given both parties "ample opportunity to address the issue" through supplemental briefing, and will exercise our discretion to decide it. *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447–48 (1993). Although the government suggested in supplemental briefing that Perez's challenge is substantive, there is no "impropriety in refusing to accept what in effect [is the parties'] stipulation on a question of law." *Id.* at 448. In addition, the government noted that "[i]f this were . . . a procedural challenge . . . it would be time-barred."

Cir. July 12, 2016) (holding timely a challenge to "the present application of an earlier rule that allegedly contradicted the agency's statutory authority").

Perez and amici also argue that 8 C.F.R. § 1208.31 merits no deference at *Chevron* step two because the agency allegedly failed to explain its interpretation of § 1158 and § 1231 when it originally promulgated the regulation. This portion of their challenge, in other words, alleges "a procedural violation in the adoption of a regulation." *Wind River*, 946 F.2d at 714. We conclude that although Perez's arguments about the substance of 8 C.F.R. § 1208.31's interpretation are timely, his arguments about the alleged procedural errors in its promulgation are not. We therefore decline to consider them. *See also Sai Kwan Wong v. Doar*, 571 F.3d 247, 262–63 (2d Cir. 2009) (collecting cases).

The Supreme Court's recent decision in *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016), supports this approach. There, the Court held an agency regulation that represented a change in longstanding agency position was not entitled to *Chevron* deference because the agency had failed to adequately explain its change in position. The Court explained that a "basic *procedural* requirement[] of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Id.* at 2125 (emphasis added); *see also id.* ("*Chevron* deference is not warranted where the regulation is 'procedurally defective' – that is, where the agency errs by failing to follow the correct procedures in issuing the regulation."). "Of course," it noted, "a party might be foreclosed in some instances from challenging the procedures used to promulgate a given rule." *Id.* (citing *JEM Broad. Co. v. FCC*, 22 F.3d 320, 324–26 (D.C. Cir. 1994)).

*JEM Broadcasting* arose in a similar procedural posture to this case. The FCC had earlier promulgated a rule preventing review of certain license applications that included inaccurate or incomplete information. *See JEM Broad.*, 22 F.3d at 322–23. The FCC subsequently declined to review JEM's defective application by citing that rule, and JEM sought to "attack . . . the *procedural genesis* of the [rule] in the context of an *enforcement action*," by arguing the rule had been improperly promulgated without notice and comment years earlier. *Id.* at 324. The D.C. Circuit held JEM's challenge was untimely:

> JEM does not claim . . . that the "hard look" rules are unconstitutional, that they exceed the scope of the FCC's substantive authority, or . . . that the rules are premised on an erroneous interpretation of a statutory term. . . .
>
> [C]hallenges to the *procedural lineage of agency regulations*, whether raised by direct appeal . . . or as a defense to an agency enforcement proceeding, will not be entertained outside the . . . period provided by statute.

*Id.* at 325 (quoting *Mountain States Tel. & Tel. Co. v. FCC*, 939 F.2d 1035, 1040 (D.C. Cir. 1991)). Although it recognized that "some parties – such as those not yet in existence when a rule is promulgated" – would "never . . . have the opportunity to challenge the procedural lineage of rules that are applied to their detriment," the court concluded "the law countenances this result because of the value of repose." *Id.* at 326. We have reached the same conclusion.

*See Wind River*, 946 F.2d at 715 ("The government's interest in finality outweighs a late-comer's desire to protest the agency's action as a matter of policy or procedure."); *see also Cedars-Sinai Med. Ctr. v. Shalala*, 177 F.3d 1126, 1129 (9th Cir. 1999) (noting a limitations period on procedural challenges is necessary "so that regulations are not indefinitely subject to challenge in court").[7]

In the absence of binding contrary authority, we apply the approach required by *Wind River* and approved by the Supreme Court in *Encino Motorcars* to conclude Perez's procedural challenge to 8 C.F.R. § 1208.31(e) falls outside the limitations period. We therefore move on to determine whether 8 C.F.R. § 1208.31(e) is a permissible construction of the statute under *Chevron* step two.

### b. The Chevron *Step Two Inquiry*

At step two of *Chevron*, we must "accept the agency's construction of the statute" so long as that reading is reasonable, "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Brand*

---

[7] Perez also argues his challenge is timely because the agency "fail[ed] to put aggrieved parties on reasonable notice of the rule's content." *JEM Broad.*, 22 F.3d at 326. We disagree. We noted in *Wind River* that "'[p]ublication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance.'" 946 F.2d at 714 (alteration in original) (quoting *Shiny Rock Mining Corp. v. United States*, 906 F.2d 1362, 1364 (9th Cir. 1990)). Here, the notice published in the Federal Register was sufficient to inform an interested party the regulation created a streamlined system for assessing claims from individuals in reinstatement proceedings and that the agency viewed such individuals as ineligible for asylum. *See* 64 Fed. Reg. at 8485, discussed above at pp. 9–10.

*X Internet Servs.*, 545 U.S. at 980.  Deference "is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988)).  With these principles in mind, we consider whether 8 C.F.R. § 1208.31(e), which prevents individuals subject to reinstated removal orders from applying for asylum but permits them to seek withholding of removal, is a reasonable interpretation of § 1158 and § 1231.  We conclude it is.[8]

---

[8] Perez and amici argue 8 C.F.R. § 1208.31(e) does not merit *Chevron* deference because the agency failed to exercise its interpretive authority at all and treated § 1231(a)(5) as unambiguous.  They therefore suggest we should remand to the agency under the rule expressed in *Negusie v. Holder*, 555 U.S. 511 (2009), and *Gila River Indian Community v. United States*, 729 F.3d 1139 (9th Cir. 2013).  We reject this suggestion.  The government's argument on appeal that the statute is unambiguous does not tell us how the agency viewed the statute when it initially promulgated the regulation.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) (noting appellate counsel's "convenient litigating position" is not entitled to deference).  Rather, agency action rises or falls on the agency's own contemporaneous reasoning, and where we have remanded under *Negusie* the administrative record has more clearly shown that "the agency misapprehended the clarity of the statute" and "mistakenly derermine[d] that its interpretation [was] *mandated* by plain meaning, or some other binding rule," *Gila River*, 729 F.3d at 1149 (emphasis added).  The administrative history does not discuss the specific language of the asylum statute, but neither does it suggest the agency saw § 1231(a)(5) as compelling the regulation's particular approach to asylum, withholding of removal or CAT protection.  On the contrary, the agency's explanation shows it applied its expertise by crafting an expedited screening process and balancing the fair resolution of claims for relief from removal against Congress' desire to provide for streamlined removal of certain classes of individuals, including those subject to reinstated removal orders.  *See* 64 Fed. Reg. at 8485, discussed above at pp. 9–10.

First, the regulation is consistent with a reasonable judgment that § 1231(a)(5) is a more specific provision than § 1158, even if not conclusively so, and is therefore "more deserving of credence" when the two provisions conflict. Scalia & Gardner, *supra*, at 183. As discussed, both parties advance reasonable arguments for why the canon favors their interpretations of the statutory scheme. At step two, however, "we are not deciding between two plausible statutory constructions; we are evaluating an agency's interpretation of a statute under *Chevron*." *Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 492 (9th Cir. 2007) (en banc). It was not unreasonable for the agency to conclude § 1231(a)(5)'s prohibition on "any relief under this chapter" forecloses individuals from applying for asylum relief. Indeed, the other circuits to consider this issue have concluded it does. *See Jimenez-Morales*, 821 F.3d at 1310; *Ramirez-Mejia*, 794 F.3d at 490; *Herrera-Molina*, 597 F.3d at 138–39.

Second, the agency's approach is consistent with Congress' intent in IIRIRA that the reinstatement of a previous removal order would cut off certain avenues for relief from removal. Reinstatement was designed to be "a different and far more summary procedure" than regular removal. *Moralez-Izquierdo*, 486 F.3d at 491. To that end, Congress intended § 1231(a)(5) to subject more individuals to reinstatement proceedings and to "limit[] the possible relief from a removal order available to them." *Fernandez-Vargas*, 548 U.S. at 33; *see also Ramirez-Mejia*, 794 F.3d at 490. Forbidding asylum applications from individuals in reinstatement proceedings, although harsh, is in keeping with this approach. *See Barnhart v. Walton*, 535 U.S. 212, 219 (2002) (upholding an agency construction that made "considerable sense in terms of the statute's basic objectives"). Furthermore, the agency's interpretation is a

reasonable construction of the legislative history we discussed above, which is at least consistent with the view that, in enacting § 1158(a)(1) and § 1231(a)(5) together, Congress assumed the phrase "any relief under this chapter" would include the asylum provision in the statute. *See Chevron*, 467 U.S. at 862 (noting that when legislative history "as a whole is silent" on the "precise issue" before the court, it may nonetheless be "consistent" with a particular interpretation of the statute). Had Congress intended to include a carve-out for asylum relief, it could have done so explicitly when it wrote § 1231(a)(5) or revised § 1158.

There are nonetheless some weaknesses in the agency's approach, but they are not fatal to its interpretation. We have already noted that, notwithstanding § 1231(a)(5)'s bar on "any relief" under chapter 12, the Attorney General has interpreted that section to permit individuals to seek withholding of removal, CAT protection and U Visas – all forms of relief that, like asylum, arise under chapter 12. *See* 8 C.F.R. §§ 214.14(c)(1)(ii), 1208.16(c)(4), 1208.31(e). The government suggests this policy draws a reasonable line between discretionary and nondiscretionary relief, and the Supreme Court acknowledged "the practical import of th[at] distinction," albeit in a slightly different context. *Cf. INS v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987) (holding it was "not . . . at all anomalous" that asylum applicants and applicants for withholding were governed by different standards of proof and stating there was "no basis for the . . . assertion that the discretionary/mandatory distinction has no practical significance").

This explanation, however, fails to account for why, under the Attorney General's regulations, individuals in reinstatement are permitted to apply for U Visas – a form of

discretionary relief – but not for asylum. It may be relevant that U Visas were created in 2000, four years after IIRIRA implemented the revised asylum statute and the reinstatement bar. *See* Victims of Trafficking and Violence Prevention Act of 2000, Pub. L. No. 106-386, § 1513, 114 Stat. 1464. In concluding that the Attorney General's approach in 8 C.F.R. § 1208.31(e) is reasonable under *Chevron*, however, we note the Supreme Court apparently found nothing inconsistent between the "absolute terms" by which § 1231(a)(5) bars relief and the government's decision to make certain forms of relief from removal available in reinstatement proceedings. *See Fernandez-Vargas*, 548 U.S. at 35 n.4 ("Notwithstanding the absolute terms in which the bar on relief is stated, even an alien subject to [§ 1231(a)(5)] may seek *withholding of removal* under [§ 1231(b)(3)] . . . , or under 8 C.F.R. §§ 241.8(e) and 208.31. . . ." (emphasis added)); *see also Jimenez-Morales*, 821 F.3d at 1310 (citing *Fernandez-Vargas*, 548 U.S. at 35 n.4); *Herrera-Molina*, 597 F.3d at 139 n.8 (same).[9] Although the availability of asylum is an important component of our immigration law, it is not unreasonable to conclude Congress intended to bar this form of relief to persons in reinstated removal proceedings while preserving relief for individuals able to meet the higher standards for withholding of removal and CAT relief. *See Ramirez-Mejia v. Lynch*, 813 F.3d 240, 241 (5th Cir. 2016) (denying rehearing en banc) ("Even if withholding of removal and CAT protection are slightly less potent remedies than

---

[9] In *Fernandez-Vargas*, the Supreme Court parenthetically described 8 C.F.R. §§ 241.8(e) and 208.31 as "raising the possibility of asylum." 548 U.S. at 35 n.4. This appears to have been an oversight; although both regulations refer to "asylum officers," they clearly permit only withholding from removal. Indeed, the main text of the Court's footnote correctly refers only to "seek[ing] withholding of removal" under those regulations.

asylum, the difference may well be consistent with Congress's intent to penalize illegal reentry. We need not justify the difference, but we note possible reasons for it.").

In addition, although the Attorney General's interpretation makes sense as applied to an individual who has already had an opportunity to seek asylum upon his initial entry to the United States, it does not account for individuals in reinstatement proceedings who may have compelling claims based on new circumstances arising subsequent to their previous removal proceedings. The Attorney General's interpretation of § 1231(a)(5) may have dire humanitarian consequences for individuals in reinstatement who seek relief from removal, either because they were previously denied asylum and are now subject to changed circumstances or because they were improperly denied an opportunity to seek asylum during their earlier removal from the United States. However, the government has discretion to forgo reinstatement and instead place an individual in ordinary removal proceedings. *See Villa-Anguiano v. Holder*, 727 F.3d 873, 878 (9th Cir. 2013). Once in ordinary proceedings, the individual can raise an asylum application without implicating § 1231(a)(5)'s bar. The government has followed this procedure before, *see, e.g.*, *Maldonado Lopez v. Holder*, No. 12-72800 (9th Cir. dismissed Feb. 4, 2014), and we assume it will continue to exercise that discretion in appropriate cases, such as those presenting strong humanitarian concerns. To the extent this consideration "really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress," it cannot invalidate the agency's interpretation at *Chevron*'s second step. *See Chevron*, 467 U.S. at 866.

In sum, despite our reservations, we are not persuaded that 8 C.F.R. § 1208.31(e)'s interpretation of § 1231(a)(5) and § 1158(a)(1) is an unreasonable construction of the statute. *See Chevron*, 467 U.S. at 843–44. It is consistent with the broad language of § 1231(a)(5), with Congress' intent to make reinstatement an expedited process for removing individuals who reenter the United States and with the overall legislative history of both provisions.

Perez's remaining arguments to the contrary are not persuasive. First, Perez and amici argue the Attorney General's interpretation of § 1231(a)(5) is contrary to the structure of § 1158 itself. They focus in particular on § 1158(a)(2)(D), which provides that an applicant's second asylum application "may be considered" if he shows changed circumstances materially affecting his eligibility for asylum. Perez and amici argue that if § 1231(a)(5) categorically forbids an individual in reinstatement from applying for asylum, § 1158(a)(2)(D) is superfluous. This argument incorrectly assumes that any individual to whom § 1158(a)(2)(D) applies will *necessarily* be subject to a reinstated removal order. Not so. The reinstatement of a prior removal order is neither "automatic" nor "obligatory," and the Attorney General has discretion not to reinstate an individual's earlier removal order and instead place him in ordinary removal proceedings. *See Villa-Anguiano*, 727 F.3d at 878 (quoting *Alcala v. Holder*, 563 F.3d 1009, 1013 (9th Cir. 2009)). If the Attorney General elects to place an individual who previously applied for and was denied asylum into ordinary removal proceedings upon his reentry to the United States, § 1158(a)(2)(D) is not superfluous. On the contrary, it affirmatively authorizes a second asylum claim in

light of his changed circumstances – something that would ordinarily be precluded by § 1158(a)(2)(C).[10]

Second, Perez and amici argue the asylum statute is a "closed universe" unaffected by other portions of the INA. In other words, they suggest § 1158's enumerated exceptions for eligibility to apply for asylum are exhaustive. Amici note the asylum scheme makes no reference to § 1231(a)(5), and suggest § 1158 was intended to govern asylum applications independent of the rest of the INA. The Attorney General, however, is not unreasonable for adopting a contrary view. None of the various provisions for relief under the INA explicitly refers to § 1231(a)(5), but § 1231(a)(5) specifies "any relief under this chapter." No explicit cross-reference to every affected section is necessary for us to conclude that "any relief under this chapter" can reasonably be read to preclude applications for asylum, a form of relief arising under chapter 12.

For the foregoing reasons, we hold that 8 C.F.R. § 1208.31(e) is a reasonable interpretation of the interplay between § 1158 and § 1231, and we must therefore defer to it under *Chevron*. In keeping with that regulation, Perez is not eligible to apply for asylum under § 1158 as long as he is subject to a reinstated removal order.

---

[10] Perez is a first-time asylum claimant, and alleges no circumstances that materially changed between his removal from the United States and his subsequent reentry. We therefore have no opportunity here to determine how § 1158(a)(2)(D) might affect § 1231(a)(5) in a case where those two provisions are actually in conflict.

### C.  Withholding of Removal and CAT Relief

After the BIA concluded Perez had not shown past persecution on account of his membership in a particular social group, we held witnesses who testify against gang members may constitute a "particular social group."  *See Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1092 (9th Cir. 2013) (en banc).  In addition, after the BIA rejected Perez's CAT claim because there was no evidence the Guatemalan government sanctioned his abuse by police, we held that local officials' acquiescence in torture is sufficient to entitle an applicant to CAT relief, even if the national government did not acquiesce in the treatment.  *See Madrigal v. Holder*, 716 F.3d 499, 509 (9th Cir. 2013).  In light of these intervening authorities, the parties agree we should remand on Perez's claims for withholding of removal and CAT relief.

### III.  Conclusion

We remand for the agency to reconsider Perez's applications for withholding of removal and CAT protection in light of *Henriquez-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013) (en banc), and *Madrigal v. Holder*, 716 F.3d 499 (9th Cir. 2013).  We affirm the BIA's conclusion that it could not consider Perez's application for asylum relief in light of his reinstated removal order.

**PETITION GRANTED IN PART AND DENIED IN PART; REMANDED TO THE BIA.**

Each party shall bear its own costs on appeal.